Good morning. May it please the court. My name is Jim Park. I'm here on behalf of Mark Lewis Sandon, who's the defendant appellant on this case. He's currently serving a 17 and a half year sentence for being a felon in possession of a firearm, one firearm. At the outset of this case, it should have been a very straightforward case. One gun was found, allegedly found on Mr. Sandon in a vehicle that he was driving. But the procedure history is a little bit turbulent in the sense that Mr. Sandon's case was being passed around like a hot potato. At first, the state of Arizona county attorney's office with the Maricopa County attempted to prosecute him based on a witness who exonerated Mr. Sandon at the time, Anthony Bocassini, who later turned out to inculpate him in federal district court. His testimony changed substantially between the time the case was originally initiated in the state of Arizona and by the time it progressed through the federal district court. After the case was dropped by the Maricopa County attorney's office, the attorney general's office in the state of Arizona picked up the case. For reasons unknown, they again decided not to pursue the charges. While Mr. Sandon was serving a state conviction for an unrelated crime, the United States government indicted Mr. Sandon in July of 2001. For unknown reason, maybe out of incompetence or maybe deliberate timing, they did not file a detainer notice on Mr. Sandon. When he was finally arrested after he completed his state offense and was brought before the district court for initial appearance, the federal government moved to dismiss the case for violation of the Speedy Trial Act because they didn't comply with the detainer issues. Two days later, the government filed a new complaint alleging the same violation against Mr. Sandon. After he was arrested again, however, the government missed their 30-day Speedy Trial time to indict Mr. Sandon. After the defendant filed a motion to dismiss the complaint, the government also agreed to move to dismiss the complaint. While that dismissal was pending, the government began its dance with Anthony Bocassini, who became a cooperating witness. Subsequently, while the motion to dismiss was still pending with the magistrate court, the government sought out, after the 30-day time limitation had expired, returned an indictment against Mr. Sandon. That issue was finally raised with the district court, and the issue was raised and argued, and the defense asked for dismissal with prejudice, and the government asked dismissal without prejudice by conceding they had violated the Speedy Trial Act. At the time of the argument, which occurred in October of 2002, defense was not aware that Mr. Bocassini was a cooperating witness because we had not received disclosure regarding the free talk that he had in April of 2002. And we argued to Judge Teelborg that the timing of the indictment, the nature of how the government manipulated the system, and how they gained a tactical advantage by turning an exculpatory witness into an inculpatory witness during that time. Can I just get the sequence straight? Now, there's the free talk in April. Of 2002. Right. And then the motion to dismiss for missing the deadline when you don't know about the free talk. That is correct. Occurs when? In October of 2002. Okay. And then there's a subsequent? Then what happens is the subsequently Judge Teelborg dismisses the case. Then in December of 2002, the government refiled the indictment. And just prior to trial, we received disclosure that, indeed, Mr. Bocassini had become a cooperating witness. Counsel, I'm not sure I track with why there is a link between the delay and the turning of Mr. Bocassini, which it seems to me is key to ensuring a prejudice. Why did the delay allow that to happen or somehow become a factor in that occurring so as to actually create prejudice for your client? Well, I think one of the things that the Assistant United States Attorney made representations to the court during the dismissal argument was, these are mere speculations by defense. They're speculating that we have flipped them, this witness is cooperating. Well, we could only speculate because we couldn't verify for a fact that he did, indeed, was cooperating. And that goes to the issue of prejudice. But how did the fact of delay in the – I guess this is in the second indictment, so it's a question of not filing within 30 days after the filing of the complaint. How did that delay contribute to Mr. Bocassini turning? I think during that time they were to solidify the case. During that – it almost looks like it's only a 15-day delay, but during that time they had met with him several times. I believe they also met again with him in July. The – during that time delay they were able to gain a tactical advantage. They had flipped the witness, and in July of that same year they had entered into a cooperation agreement with Mr. Bocassini. In fact, he entered a plea during that time. Well, if my calendar here is correct, seven days elapsed from the date of the filing of the complaint, April 19th, to the free talk on April 26th. So how is the delay in bringing an indictment within 30 days after April 19th affect Mr. Bocassini flipping on April 26th? What happened was when he decided to flip on April 26th, they probably didn't get every information they need. They didn't get all the information they need to solidify the case against Mr. Sandin through Mr. Bocassini. They need to set up the subsequent meetings to solidify their case against Mr. Sandin, and they got that extra time. When this case eventually went to trial, we only asked for one 30-day continuous. This case went to trial within, I believe, seven days of the time that the final indictment was returned. We – I believe it was the final indictment, the third indictment was returned in December. We went to trial in March, and we only had asked for one continuous. We did not cause the delay. We didn't even know about some of the delays that's attributable. And the – Mr. Bocassini's flipping in the history, the procedure history of the case also ties into the second argument, which deals with the evidentiary ruling by the district judge. Now we're on the third judge at this time, and Judge Strand had limited the defense from mentioning the dismissals of the federal indictments or the federal complaints. And that issue is really crucial because it goes to the bias of the witness, and that's, again, to the timing of Mr. Bocassini. Mr. Sandin's case is dismissed on April 17, 2002. Mr. Bocassini comes down and picks up Mr. Sandin from the federal court after the case is dismissed. He even admits that during trial. Nine days later, he's meeting with the federal government and talking about how to resolve his case and how to implicate Mr. Sandin. That goes directly to the bias of the witness, a cooperating witness, and the district judge would not let the defense argue that issue. And that is a total abuse of discretion. But how does the dismissal of the indictment somehow bear upon a true issue of impeachment? How does it make Mr. Bocassini's testimony more or less credible? I just don't quite understand that. Sure. Mr. Bocassini's got a federal case pending. What does he do? He knows that he can give up somebody. Now, they're interested in Mark Sandin because they've been talking to Mr. Bocassini. The ATF agent's been talking to Mr. Bocassini. He finds out, hey, how did you, you know, I picked you up. Mark Sandin calls him up. Mr. Bocassini comes out and picks him up. Mr. Sandin talks about, hey, what you doing down here? I'm doing all right. My case just got dismissed because they didn't file the detainer on me. Light bulb hits Mr. Bocassini. Hey, it's time to talk to the government. I can flip now. That goes to his bias. He still has his case unresolved. Why could he flip then upon learning that Mr. Sandin's indictment had been dismissed? Because now he knows that the feds are interested because he had given a different statement to the county attorney's office, which resulted in the dismissal of the case. As far as Mr. Bocassini knows, because Mr. Sandin was in prison, state prison, he doesn't know what's going on with this case. There's one person now he can give up and to get rid of his mandatory minimum sentences for his pending offense. And when he finds out that Mr. Sandin was indeed charged in the federal system for the very gun and his case was dismissed without prejudice and all likely the case was going to be refiled. I mean, everybody knew that it was going to be refiled. It was just a question of when. Here's Mr. Bocassini's opportunity right there. I have somebody I can give up today. Now then he does the free talk a week, ten days later, nine days later. That goes to his credibility and his bias. I'm trying to figure out what the argument you're now making. Are you making an argument as to the second dismissal or are you making an argument as to an evidentiary ruling of the trial? The evidentiary ruling of the trial. I couldn't impeach Mr. Bocassini now about why, the motivation for his cooperation. In fact, at trial he testified, well, I've turned my life around. I'm just trying to do the right thing. When we were able to show the timing of his cooperation, that would have undermined his credibility about the true motive for cooperating. Were you able to show that he got some or expected some benefit from his testimony? We were able to get some. We just couldn't show the crucial issue of his when he chose to flip. He came off as a guy who turned his life around. He was on drugs before. He was all clean. And at the time that he decided to cooperate, it wasn't really his idea. It was his attorney's idea. They set things up and he just came in and went along. And he was just trying to do the right thing. That was the impression that he was trying to give the jury. But we could have pointed out the fact that your decision to cooperate occurred just nine days after he found out about Mr. Sandin's dismissal. I think the jury would raise their eyebrows considering that this guy is receiving incredible benefit from the federal government just from the plea agreement itself. But also, boy, maybe he's not as so nice about really turning his life around that there was really more ulterior motives to cooperate against his former friend. And we review that evidence you're ruling on abuse of discretion. That is correct. And you argue that that's an abuse of discretion to have excluded him. That is correct. And under Davis v. Alaska, when it goes to the bias or motive, the witness, those things are always relevant and those should be admitted to attack the credibility of the witness, especially in a case like this where it was the cooperating witness's testimony that really did Mr. Sandin in, as the evidence at best was very weak. Even the officer who arrested Mr. Sandin originally did not notice the firearm. So the government's case rested significantly on Mr. Bocconcini's testimony and we should have been able to attack his credibility. Finally, Your Honor, the trial judge in this case applied the Armed Career Criminal Act enhancement. And I think the government and we are in agreement as the one principle, that in reviewing whether a predicate felony qualifies as crime of violence for Armed Career Criminal Act or ACCA purposes, you take the categorical approach, as articulated in Taylor v. United States. And when you take the categorical approach as to this particular conviction, which is a 1977 conviction under 1976 version of Arizona statute burglary, when you take the categorical approach, this is what Taylor says. There are three elements that must be satisfied in order for a burglary to qualify as a burglary or for a state conviction to qualify as a predicate burglary for ACCA purposes. And those are there has to be unlawful entry, there has to be unlawful entry. And that is the key issue, unlawfulness. Under then, under back in 1977, the statute, the Arizona burglary statute did not, you can be convicted of a burglary without any unlawful entry. In fact, you can have a privileged entry and still be convicted of burglary. That has since been amended in 1978. But back in 1977 when Mr. Sandin was convicted, that element did not, it was nowhere on the books in that burglary statute. And under the categorical approach, the analysis should stop there. Hey, you go through the analysis, the elements are missing, we stop. Which means you move to the modified category. No, I think that's it, Judge. That's not it. If there are sufficient documents in the record from which we may conclude that even though the statute covers more behavior than it falls within the generic definition of burglary, he nonetheless was convicted of something that falls within the generic, you got him. So you've got to move to the modified categorical and you've got to talk about what you said at the plea agreement. I would respectfully disagree on that. You observed that point. I understand. But for me, I'm headed for modified categorical. And considering the modified category. Is there a Ninth Circuit case that contradicts? I believe Rivera-Sanchez. It only talks about you go to the next modified category approach if it encompasses both the non-generic burglary and the generic burglary. In this case, it could be the case. I just wanted to know what you were saying. And then when we go to the modified categorical approach, what can the court consider? The court can consider the plea transcript, unfortunately, there's a prevailing Ninth Circuit precedent which allows the court to consider the plea transcript. What in the plea transcript can the court consider? And it's very clear that you cannot consider the underlying facts of the case, the underlying conduct. What you can consider is the elements of the offense. And if you look at Mr. Sandin's transcripts, the very elements that he was advised of as part of his change of plea by the trial judge, the superior court, he was never advised that it had to be an unlawful or unprivileged entry into a home. I understand what the elements of the crime in Arizona were at the time. And I understand what he was advised were the elements of the crime. But as I understand our case law, if he nonetheless clearly admits conduct that falls within the generic definition, you got him. So I have to read the story. In my view, at least, I've got to read what he said. Now, I think that would be in violation of what the United States, Taylor v. United States, you don't, then you're looking into the underlying conduct. You're looking at the underlying facts of the case. I mean, that's what. Well, the concern is you can't retry the case. But you can look at what he admitted to. What happens at that point is these are extraneous facts. What do you have to look at? What elements did he admit to? And those are the elements he admitted to. The other facts, the conduct encompassing the non-essential elements are extraneous facts. And now then the court is required to look at going beyond the plea transcript, looking at the underlying facts of the case. And that's where the problem occurs because that's what Taylor had talked about. You know, what you end up doing is you start looking at the facts. You start litigating all the issues. Then what? Do you have a jury issue determination on those facts now, which is what's being litigated regarding Blakely enamel line, and that may also be applicable to this case. I filed a Rule 28J letter regarding that issue. So when he says, acknowledges that the purpose of going there and knocking on the door was to see if anybody was home, and if nobody was home, you were going to enter to see what money or property you could steal. Yes, sir. He admits to that. Then you're saying that to take that into account as effectively admitting unlawful entry is actually looking at the facts of the case. That is correct, Judge. Now, assuming I – and I understand you disagree with me on this point, but assuming I can look at that, has he admitted unlawful entry? He's admitted he knocked on the door. Nobody was in there. He went in. Is that unlawful entry? When he says he's going in to steal? I guess I can't really argue that it's a lawful entry. Oh, yes, you can. If I were you, I would. Well, I mean, he can't – Wait a minute. That's not binding in the Ninth Circuit yet. Let me give you another example. That is to say, I knock on the door. I'm the gardener. I ordinarily have – you know, I have free access. I knock on the door this time, as I always do. Usually I go in just to get a glass of water, but this time I'm going in to steal. As the fact that I now have a different intent as I go in, I'm still the gardener. He always lets me come in. That's still a lawful entry. It may be – you may end up permitting the crime of burglary under Arizona because you can form the intent even after you get in there, even if you had a lawful entry. So in that way, it is not unlawful. Mr. Standen, his presence in the garden area or in the front porch area was a lawful entry into the fenced yard. I would like to reserve the rest for everybody. Thank you. Thank you, counsel. I was trying to save your client. Yeah, but he's trying to be candid. Good morning. Michael Morrissey on behalf of the government. The defendant procured a dismissal of the state charges against him by procuring Bocassini to lie for him. He perpetrated a fraud upon the Maricopa County Superior Court. And there was very little question about that. Exhibits 4 and Exhibits 5, which went into evidence at trial, were the lies that Standen wrote out that he wanted Bocassini to say. And those lies were initially successful. So when you talk about a tactical advantage, Mr. Standen liked the situation where his fraud on the Maricopa County Superior Court had worked, and he wants to freeze that in time. But that cannot be legal prejudice, where a defendant seeks to benefit from a fraud upon a state court that he committed. And there's no question. In these exhibits, it came out at trial that Mr. Standen, in communicating with Mr. Bocassini, also said, I'll write out her testimony too. That's at ER 65, referring to another witness. So it may have been through negligence or even incompetence by the assistant United States attorney that there was some delay that led to the exposure of this fraud. But that is not a matter of prejudice to the defendant. And I would also point out that it is completely incorrect that the government did so in some way as to gain a tactical advantage. All parties agree that on April 26, 2002, Bocassini met with the government and told them the truth, that it was his gun, but that Standen knew it was in there and had asked to take it. As of that time, the government had approximately 19 days to indict by May 19th and not below the 30-day deadline. Nonetheless, the government did not indict by May 19th and did blow the 30-day deadline. And in doing so, rather than gaining a tactical advantage, the government put at peril its own case by putting itself in a situation where there was going to be an inquiry into whether or not the dismissal should be with or without prejudice. So on every basis upon which defendant asserts that the government was acting strategically or tactically, in fact, it was not. And secondly, the fraud upon the court theory is very important, as this court looks at whether the dismissal should have been with or without prejudice. One of the factors is the impact of a reprosecution upon the administration of justice, and the exposure of a fraud on a court is a significant factor in favor of permitting this prosecution to go forward. In terms of the, quote, limitation on the cross-examination of Mr. Bocassini, Mr. Bocassini did not flip himself out of danger. Even as of the time of trial in March 2003, yes, he had pled guilty to some weapons charges and he was getting a cooperation agreement, but there was an entire outstanding arrest for running a meth lab in the back of his car for which no one had made any deals or promises to him, and that was explored at trial. Mr. Bocassini was confronted with the fact that he was a felon, that he'd been a daily, I don't want to say daily, he'd been a frequent user of drugs, including methamphetamine, that he'd had a head injury, that he had a cooperation agreement, that he was hit with whether or not he had to say correct things so that the government would not only give him this deal but wouldn't prosecute him on the meth case. The cross-examination may, in fact, have been devastating. We don't know. But what the jury was able to find, not just on Mr. Bocassini's testimony, but through the handwriting expert who said Exhibits 4 and 5, the false letters writing out the testimony were written by Mr. Sandin, by Officer Spahr, who pulled the defendant over when no one else was in the car, and the defendant was in the car and he saw where the gun was. Furthermore, you also had the – so I raise that to say, this case was not only about Mr. Bocassini's testimony. In light of the officer's testimony, in light of the expert's testimony, in light of the letters, Mr. Bocassini, in fact, may not ever have needed to testify. The jury could have convicted on these facts and found that the defendant was a felon in possession just based on that evidence alone. And we don't know. The jury may have set aside Mr. Bocassini's testimony, and there was still more than sufficient evidence to convict. Now, turning to the determination that the defendant was, in fact, an armed career criminal. Before you leave that, under Taylor and the statute, when the district court declines to dismiss with prejudice, it's supposed to lay out an explanation of its reasoning and how it considered the three factors. And all that the order does is simply say that the court does not find bad faith on the part of the government or that the 15 days additional delay caused defendant prejudice, the delay was simple negligence. How does that comport with articulating the court's reasoning? It's probably not best practice. United States v. White is also clear that this court's case that says the court should specifically deal with all three factors. But Pena-Carrillo also says that where the record is complete, that there's no reason for a remand for reconsideration of those factors because the appellate court can, in fact, make the determination. And so I've got a bit of a hybrid argument. It's very clear the district court did hold a hearing on this matter on October 10th, and then the next day it issued its order. So there was a developed record. Could the district court have done a better job of articulating the three factors? Yes, it could have. Is that a problem at this stage? Not on this record because of what Pena-Carrillo tells us is that where the record is complete and it's clear that looking at the factors, you did have a serious offense. The facts that led to the dismissal were simple negligence. The court did make that finding. Nothing in those facts, and I believe I've demonstrated there was, in fact, no tactical advantage to the government. In fact, the government almost hurt itself. And the impact on the administration of justice. So it's all in the record from which this Court can find. One point on tactical advantage is troublesome to me because it would have been helpful if the Court had made clearer findings in that regard. The Court at least implicitly made the finding that the government had not acted to its tactical advantage, and it did so in this way. At that time, the Court didn't know that Boccacini had been flipped. And that's a subtle point because the defendant claims, I didn't know that Boccacini had, quote, been flipped. Okay. Well, he certainly argued that at the hearing on the motion to dismiss. Yeah, but the U.S. – were you the U.S. attorney? No, I was not. The U.S. attorney says, hey, we don't even talk – I haven't even talked to anybody else in the House. No, Judge, I think that goes to a different point, and let me point this out. One of the arguments at the motion to dismiss was, hey, there's unfair tag-teaming going on here between the Attorney General's office and the county attorney's office and the United States attorney's office. I believe it's quite clear from context that what the assistant United States attorney was saying is, I have not talked to these other police agencies. Okay. I don't think there's any way to argue that statement as the AUSA had never talked to anybody within his own office. That's impractical given the way that cases get passed around. Well, I wondered. It would not be a good management if there wasn't discussion, but okay. On the other hand, management of this suit does not seem to have been your strong suit. Management of this particular case? Let me – let me be clear. The court's finding that the government's failure to indict within a timely fashion with respect to the second indictment as being negligent was perhaps charitable. I mean, at some point negligence slides over into incompetence. It should have been done. But the fact is, under the proper analysis of how this case is looked at, there was no prejudice to the defendant that was significant. In fact, there was an exposure of his criminal behavior, obstruction of government, and fraud upon the Maricopa County Superior Court. The defendant had already – not the defendant – Boccacini had already told the truth well within a timely framework for the government to indict. So very clearly the government had no tactical advantage in acting that way. So on this record, despite the government's faults, there is no basis to find that the dismissal should have been with prejudice. Turning then to whether or not the conviction for burglary was a conviction that qualified, the Arizona statute at the time was a statute that was overbroad. And under both Taylor and Bonat, this – not this court, the Supreme Court and this court – made it clear that overbreath triggers an inquiry. And what was the overbreath? The 1977 Arizona statute talked about breaking into automobiles, okay? And that would not be classic common law or generic burglary. That's exactly a circumstance noted in the Supreme Court case with Taylor, and it was noted in Bonat as well. Having made that inquiry, the court was – it was very appropriate, because as this court said in Bonat, it's no more of a factual inquiry to look at the plea transcript than it is to examine a signed plea statement. So the court had to look. And when the court did look at properly the change of plea transcript, it was very clear what the defendant had to have done as he committed this crime. Let me ask you, though, just to work a little bit on what constitutes unlawful entry under the generic idea of burglary or the common law idea of burglary. Let's assume that I'm invited to a holiday party at somebody's house. I go to that party with the intent of stealing the silverware. I come in. I steal the silverware. Was my entry lawful? Yes, because it was not unlawful, and it was consented to by the owner of the home, I'm assuming, under these facts. I was invited, sure. You were invited. So, yes. Now, under the Arizona statute, and the government has cited those cases in its brief, that would not exempt you from prosecution under the burglary statute. I understand that. I'm trying to get at what's generic burglary and, therefore, whether what he has admitted to here in the plea colloquy constitutes generic burglary. What if I'm a gardener and I have free access to the house when people are not home or even when they are home? I knock on the door, as I always do to see if there's anybody there. I have standing permission to go in and do whatever I'm supposed to do. This time, however, instead of going in to get a drink of water, I go in and I steal the silverware. Is that unlawful entry? It is not. Where are the hypotheticals? The intent was formed after the gardener took care of his thirst. Is that what you're saying? No, the intent was formed just as my intent when I went to the holiday party was. From the get-go, I want that silverware. And I was invited to the holiday party, and as soon as I got the invitation, I said, whoopee, I'm getting that silverware. Don't let the professor nail you. I'm coming, I'm coming. I have two answers, and I like one of my answers. So let me make the one I like first. My opponent is too honorable to flip-flop on this point as we speak now because, as he said in district court, it appears that it was unlawful or unprivileged, and he didn't have permission to go in. Are you quoting from your brief? I'm sorry? Are you quoting from the brief? No, I'm quoting from what Mr. Park told the district court. Oh, you are quoting from your brief. Did I just quote? Yes. Yes, and you will notice if you look back to the page from which the brief cites, it says if you read between the lines. That has been left out of your brief. Oh, that's not good practice. It's not. I didn't write this brief. I know you didn't. But you might wish to speak to the brief writer. Well, and I have some responsibility. I edited this brief, and I'm chief of the appellate section, so I take the court's point with great clarity. So the transcript, the brief says, the defendant says, and then you quote. The defendant did not say. That was counsel who said it. And further, you left out if you read between the lines. And I have a minute, and if I could, I would just like to just let. Yeah. You should turn to page. It is appellate section for record page 134. Top line. Okay. I certainly don't want to quibble with the court. You're not going to win or lose based on this. That's a separate point. Right. Having looked at the quote, I feel a tiny bit better, I will say, because there is an ellipsis, and there's an intervening clause. And then it appears that the statement somewhat stands alone. Well, let's read it aloud, then, if we have to do this. This is now Mr. Sandin's lawyer who says. At that point, Mr. Sandin admitted to then he went to the house, and he, by reading between the lines, it indicated that there was dash. Now, of course, the dash of the reporters, that there was, although Mr. Sandin didn't admit that he didn't permission, that he didn't permission, it's pretty, it appears that it was unlawful or unprivileged. Now, this is, there may have been some fault in the reproduction because there's some words obviously not there, but reading between the lines is part of that sentence. We were not close to our word limit, and there's no good reason anyway not to include the extra lines. And you're not going to win or lose on that point. Right. I completely agree with the court, and in my capacity as chief of the section, we'll make sure that point gets made. My point in getting into this. Let's get back to my guy who comes to the holiday party and says, I like that silverware, please. In one second. My point in raising this thicket is that Mr. Park, even in the district court, seemed to recognize what the government recognized was that the defendant here seemed to be saying it was unlawful. If you read between the lines, but I'm a little unclear as to whether you get to read between the lines in a plea agreement, if we're trying to do modified categorical. But, again, that's the defense attorney's interpretation. Let's come back to what is unlawful entry. Now, the gardener who has standing permission to enter forms his intent before he goes in. And if nobody's home, I'm getting the silverware this time. Is it unlawful entry because at the time he went in, he had the unlawful intent formed? I believe it is because it's. Then why don't you change the answer to my first one when I go to the holiday party? I'd like to. But if that's so, I think. The decision in the case won't rest on it, but the grade in the class will. Yes. But if that's so, I think you just read unlawful entry out of the statute. That is to say, somebody comes into the house wanting to steal something. You've said, well, that automatically turns it into unlawful entry. But I think that's what is part. That's not the generic definition of burglary. That's part of what makes this so tricky. I do think the Arizona statute at the time was an overbroad statute. I do think the overbreath is what triggers the inquiry. I think the inquiry makes it clear that the elements of what he admitted to did include an unlawful entry. But I kind of figure out why. It's quite hard to believe that the definition of unlawful entry doesn't take into account the purpose for which consent was given by the invitor. So if I invite you to a party, I invite you to come into my home for lawful purposes. If you come in with an unlawful intent in your own mind, I don't think my consent obviates that. And that's why I changed my answer is because that's what finally flashed through my mind. You finally figured out what you stepped into. But if that's the answer, that is to say it automatically turns it into unlawful entry, whenever someone enters into the house at the time having an intent to steal, unlawful entry has just been read out of the burglary statute as a separate requirement. Not necessarily. Well, if I go in and make the decision, once your Gardner hypothetical, suddenly walks in and there's a wallet sitting on the table and he steals it, he didn't enter unlawfully, but he formed into an action. No, that would be a little sliver. And may I point out, you are not the first panel to struggle with this, because in the United States versus Becker case, the court analyzed a California statute and the court struggled with whether for first degree burglary in California, did unlawful have to be implied as a requirement? And ultimately the court said yes, and yet there's a troubling footnote from the government's point of view, footnote seven, that seems to say, but don't run too far with this. I point that out because it was before the district court, the Becker case was a response to the objections to the draft PSR, and that's what the government says here, 8788. And what Becker suggests is even if it's not classic generic burglary, this court may still sustain the finding because it was a crime that otherwise involved a risk of violence under the language of the statute. And so if the district court essentially got the right result for the wrong reason, he labeled it burglary, but because of the categorical approach, the district court said, no, that's wrong. This court can still affirm the finding of an armed career criminal based on the actual language of the guideline. If there are no further questions. Your Honor, it's amazing when a witness becomes a cooperating witness for the government how much of credibility they carry. It's the government argues that Mr. Boca, that Mr. Stanton committed the fraud in the courts. Maybe it's the other way. There was Mr. Bocassini who really was not honest, and he had decided to tell the truth the very first time. Then later on, to save his own skin, flipped and changed the story, and he may actually be the one who has perpetrated the fraud, and we were not able to cross-examine on that issue. Regarding the armed career criminal enhancement, I think the crucial issue, I guess the court is, by the question the court is asking is, what, under Arizona, because you don't need an unlawful entry or unlawful privileged entry, that it's not a generic burglary. And when Mr. Stanton pled guilty, those were the only elements that the trial court needs to find during change of plea to determine whether it was a burglary conviction or not, and that's what he read. He pled to a second-degree burglary under Arizona statute at the time, which did not require unlawful entry, which by very definition, as defined by Taylor v. United States, states that it's not a burglary conviction. And without that third conviction, Mr. Stanton does not qualify as an armed career criminal offender. Therefore, his conviction should be reversed, too. Thank you. Thank you very much for a helpful and candid argument on both sides. I gave you a hard time, but it's all in the spirit of we're working here together, so don't make that lawyer feel too bad. That was, I think, an innocent sort of overmistake. But I thought the Court had a good point. Thank you. But I'm not – this was not something that I regard as a capital sin. It's just – okay. I'd like to just add for counsel that this is one of the best arguments that I've had in my time on the Court, and I compliment you both. You're really well prepared, well organized, and candid. I always emphasize that. So I'm pleased to have both of you before us today. Thank you. Thank both of you very much. The case of United States v. Sandin is now submitted for decision. We'll take a ten-minute break before we resume. The case immediately after the break will be Gonzalez v. Knowles. Thank you.
judges: W. Fletcher, Fisher, Winmill